## LEWIS W. ROSS

*v.*

## CHICAGO, BURLINGTON AND QUINCY R. R. CO. *et al.*

|  |  |
|---|---|
| 77 | 127 |
| 153 | 312 |
| 77 | 127 |
| 191 | ⁵636 |

1. STATUTE—*whether amendatory of charter or not.* The act of February 9, 1854, entitled "An act to amend an act entitled 'an act to incorporate the Macomb, Vermont and Bath Railroad,' approved February 11, 1853," is not so far foreign to the object embraced by the act of February 11, 1853, as to authorize the court in holding it not to be an amendment of the last named act, and, therefore, void, as not being embraced in the purposes in the Governor's call of the special session of 1854 of the legislature.

2. SAME—*whether embracing more than one subject.* The charter of a railway company will not be subject to the constitutional objection of embracing more than one subject from the fact that it authorizes the construction, etc., of one or more extensions of the principal line, in different directions. The charter of the Peoria and Hannibal Railway Company is not obnoxious to this objection, as the extensions authorized are not regarded as independent and distinct lines from the main road.

3. CHARTER—*whether change in, when accepted, will release a party from his obligation to the company.* Where a party gave his obligation to convey to a railway company a right of way over his land, and the charter of the company was afterwards changed, and, by subsequent enactment, the company was authorized to divide its road into sections, and to let and construct any of them, which amendments were accepted by the company, and the party, being a stockholder and director of the company, expressly approved such amendments, and acted under their authority, and authorized and approved acts done under the same: *Held,* that he was not only bound, by implication, as a stockholder, to the act of acceptance of the amendments, but also by his own acts as a director, in exercising the new powers conferred, and was equitably estopped from alleging that the corporation had ceased to be that to which he became obligated.

4. SAME—*who may take advantage of a failure to complete railway in time limited.* If a railway company fails to commence work or complete its road in the time limited by its charter, the State alone can take advantage of the failure, and if it waives its right to do so, by extending the time, no one else can complain, or set up such fact as a release from his contract with the company.

5. SPECIFIC PERFORMANCE—*right to rescind contract must be exercised before the other has performed and expended money on faith of it.* Even if a party, who has given his obligation to a railway company to convey a right of way, had a right to rescind the same for delay in the construction of the road, good faith would require him to give notice of such intention before the company takes possession of the land and constructs its road, so that it may adopt another location, or take proceedings to condemn, before rendering itself otherwise liable.

6. RESCISSION—*waiver of right to.* Where a party, who had agreed to grant the right of way over his land to a railway company, after the construction of the road brought ejectment for the land so taken, and also sued in trespass for damages, and afterwards dismissed the same, upon the agreement of the company operating the road to make a cattle-pass, which was constructed at a cost of $800, the cost of which was to go in reduction of the owner's damages: *Held,* on bill for specific performance by the company, and to enjoin the prosecution of an action of ejectment for the possession of the land, that it would be inequitable to allow the owner to recover the possession of the right of way after inducing the company to incur this expense solely for his benefit, and after his election to take damages instead of the possession of the land.

APPEAL from the Circuit Court of Peoria county; the Hon. JOSEPH W. COCHRAN, Judge, presiding.

This was a bill in chancery, by the Chicago, Burlington and Quincy Railroad Company, and the Peoria and Hannibal Railroad Company, against Lewis W. Ross, to enjoin the prosecution of an action of ejectment, brought by Ross against the first named company, and for the specific performance of an agreement of Ross to grant and convey the right of way to the same company over the land of Ross. The material facts of the case are stated in the opinion.

Mr. J. S. WINTER, and Messrs. COOPER & BASSETT, for the appellant.

Messrs. JUDD & WHITEHOUSE, for the appellees.

Mr. Justice Scholfield delivered the opinion of the Court:

Lewis W. Ross having commenced an action of ejectment against the Chicago, Burlington and Quincy Railroad Co. to recover possession of a strip of ground occupied by it for its right of way across a certain tract of land owned by him, at Lewistown, in Fulton county, the present bill was filed to enjoin further proceedings in that suit, and to enforce the conveyance of the strip of ground in question by Ross to the company.   The decree of the court below was in conformity with the prayer of the bill.

The Chicago, Burlington and Quincy Railroad Company derives whatever rights it may have, in the right of way referred to, by conveyances from the Peoria and Hannibal Railroad Company to Joy, and from Joy to itself; and the first objection taken to the decree below is, that the Peoria and Hannibal Railroad Company never had any legal existence.   The objection is not as to the mere regularity of the incorporation, but it is, that what assumes to be the charter of that company was and is no law, because enacted at a special session of the General Assembly convened by the Governor, and not embraced in the purposes enumerated in his proclamation, for which the special session was convened.

The act under which "The Peoria and Hannibal Railroad Company" claimed to be incorporated, was enacted at the special session of the General Assembly which convened February 9, 1854, and was approved on the 24th day of that month.   (Laws 1854, p. 237.)   It was entitled "An act to amend an act entitled 'an act to incorporate the Macomb, Vermont and Bath Railroad Company,' approved February 11, 1853."   Among the purposes enumerated in the proclamation of the Governor for convening the General Assembly at that time, were the following:   "To amend charters of towns, cities, railroads, ferries, dykes and plankroads, and to extend the same."   (Legislative Journal 2d Sess. 18th General Assembly,

9—77th Ill.

·p. 18.)   The question is, therefore, was the act of February 24, 1854, what, by its title, it professed to be?

By the·first section of the act of February 11, 1853, the persons therein named were incorporated, by the name and style of the "Macomb, Vermont and Bath Railroad Company," and empowered to locate, construct and maintain a railroad, etc., commencing at the town of Macomb, in the county of McDonough, running from thence, on the most eligible route, to the town of Vermont, in the county of Fulton, and from thence, on the most eligible route, to the town of Bath, in the county of Mason.

The seventeenth section of the same act also authorized the company to extend their railroad from Macomb to a point opposite, or at the city of Burlington, in the State of Iowa, on the most eligible route, and to also extend their railroad from Bath, in Mason county, to some point that might be agreed upon, on the Petersburg and Springfield Railroad. (See Private Laws of 1853, p. 20, *et seq.*)

It was enacted by the first section of the act of February 24, 1854, that the name of the "Macomb, Vermont and· Bath Railroad Company," be changed, and that hereafter said company be known and called by the name and style of "The Peoria and Hannibal Railroad Company," and that said company be authorized and empowered to survey, locate, construct and fully complete and operate an extension of their said railroad from the town of Vermont, in the county of Fulton, by the way of Lewistown and Canton, in said county, to the terminus of the Peoria and Bureau Valley Railroad, at or in the city of Peoria, and from the town of Vermont aforesaid, by the way of Rushville, in Schuyler county, and Mount Sterling, in Brown county, to a point on the Mississippi river, as nearly as practicable, opposite the city of Hannibal, in the State of Missouri.   By the fifth section it was provided, that the company should not be required to construct the line of their road from the town of Macomb to the town of Bath, and that the work on said extended rail-

road should be commenced within five years, and completed within eight years after the passage of the act.

The act of February 11, 1853, contained seventeen sections, and by the act of February 24th, 1854, five of these—the second, third, fourth, fifth and sixth—were expressly repealed; but the remaining sections, except in so far as they were inconsistent with the provisions of that act, were left in full force.

We do not feel authorized to hold, as a matter of law, that the entire purpose and scope of the act of February 24, 1854, is so foreign to the objects embraced by the act of February 11, 1853, that it can not be held to be an amendment of that act. Its leading objects might all still be attained under the charter as amended—not necessarily, it is true, but possibly—and some of them were entirely unaffected by the amendment. Precisely how far the original purpose of a statute may or may not be changed by an enactment professing only to be an amendment, we will not undertake to say. The legislative determination in this respect can not, in any view, be disregarded, unless it is clearly wrong; and that is not established to our satisfaction in the present instance.

A further objection to the constitutionality of the charter of the Peoria and Hannibal Railroad Company, as constituted by the various amendatory statutes, insisted upon, is, that it embraces more than one subject—that is, the location and construction, etc., of more than one line of road.

The same objection was argued in *The Belleville, etc., R. R. Co.* v. *Gregory,* 14 Ill. 28, and overruled; and what was there said on this point is equally applicable here. The court said: " The first inquiry, then, is, does this law embrace more than one subject? The subject of this law is the incorporation of a railroad company. No other subject is introduced into the law, and but one company was created by it; but it was urged that two roads were authorized to be constructed by the law, if this extension is sustained. Even admitting that this would make the law obnoxious to the constitutional

objection, the fact does not sustain the objection. With the extension to Alton, there will be but one continuous road, and that on a much straighter line than many other roads in the State. If we are to look at the line of road authorized to be constructed, for the purpose of determining whether the bill embraces more than one subject, we shall find the law as free from objection as most others of a similar character, and much more than some others. Take, for instance, the Illinois Central Railroad Company, providing for the construction of a main trunk, and Chicago and Dubuque branches, the former of which projects from the main road over two hundred miles from its terminus at Chicago, presenting the same objection in a much higher degree.  *  * Should we hold this law to be unconstitutional for the reason urged, but few railroad charters in the State could survive the test." We can not now reconsider the rule of construction then announced. It has ever since been accepted and acted upon as the correct exposition of the clause of the constitution involved. See, also, *City of Ottawa* v. *The People ex rel.* 48 Ill. 233.

It can not be claimed that, by the charter of the Peoria and Hannibal Railroad Company, the construction of two or more distinct and independent lines of road was contemplated. The authority was merely to construct, etc., one or more extensions of the principal line, in different directions, as in the illustration given in the opinion from which we have quoted.

The proof of acceptance of the various amendatory acts by user, etc., under them, is ample. Indeed, no question is raised in argument on this ground.

An instrument, of which the following is a copy, was executed and delivered to the railroad company by Ross:

"*Know all men by these presents:* That I, Lewis W. Ross, of Lewistown, Fulton county, Illinois, in consideration of one dollar to me in hand paid by the Peoria and Hannibal Railroad Company, the receipt of which is hereby acknowl-

edged, do hereby agree to release and convey unto said company the right of way for said railroad over any land, or town lots owned by me, in Fulton county, Illinois, except those having buildings on the line, and to execute and deliver to the said company a proper release and conveyance of the same as soon as the said road is located.

"In testimony whereof, I have hereunto subscribed my name and affixed my seal, this 26th day of June, A. D. 1854.

"Lewis W. Ross.  [seal.]"

It is contended, because the road was not completed within eight years after the passage of the act of Feb. 24, 1854, as required by the 5th section of that act, and because, also, by a subsequent amendment to the charter, the company were allowed to divide the line of road into sections, and to complete it in that way, the promise contained in this instrument ceased to be obligatory.

An amendatory act, entitled "An act to amend an act entitled 'an act to incorporate the Macomb, Vermont and Bath Railroad Company,'" was enacted by the legislature, and approved Feb. 14, 1857. By the 4th section of this act it was provided, that the Peoria and Hannibal Railroad Company should have the right, by its directors, to divide the route of its road, running from Peoria to Hannibal, in divisions, to let, construct and operate any of such divisions, and also to call in installments on stock from stockholders interested in, or near the line of such divisions so to be constructed, and apply the same on such part so to be built and operated; and it was also thereby empowered to unite its road with any other road, now or hereafter constructed, at its *termini*, or any point thereof where the same or any part thereof may come in contact with any such road; to issue bonds, bearing any rate of interest not exceeding ten per cent per annum, and to mortgage, sell or lease their said railroad and its equipments, rolling stock, station houses, or any portion or part thereof.

The 6th section was as follows: "This act shall not, in any respect, affect the subscriptions of stock voted or sub-

scribed by any county, city, corporation or persons.   The said company may commence the work on said road within three years; and if any division thereof be completed within eight years after the passage of this act, then this act to remain in full force and effect, together with the several acts to which this is an amendment." (Private Laws of 1857, 619.)

At, and long prior to, the date of this enactment Ross was a stockholder in the Peoria and Hannibal Railroad Company. He was one of the commissioners named in the act of Feb. 24, 1854, to solicit subscriptions to its capital stock, and he was active and zealous in this capacity in promoting the success of the company's undertaking.   It appears that the act of Feb. 14, 1857, received his express approval; and from 1862, in April, he was, for the period of two years, one of the directors of the company, during which time he authorized and approved of acts done by and on behalf of the company, having their only legal sanction in the provisions of that act. He is, therefore, not only bound, by implication, as a stockholder to the acts of acceptance of the company, but also expressly, by his own acts, as a director, in exercising the powers and privileges conferred by the act.

Nor do we think the adoption of this amendment worked such a fundamental change in the charter of the company as could be held to release individuals from their obligations to it upon the ground that it thereby became a new and essentially different corporation.   The cases of *Sprague* v. *Ill. R. R. Co. et al.* 19 Ill. 177, *Ill. R. R. Co.* v. *Zimmer*, 20 id. 657, are in point, and sustain this view.   The case of *Fulton County* v. *Marsh*, 10 Wallace, 676, cited as holding differently, is not analogous.   There, the subscription was made to a corporation which was subsequently divided, and made into three corporations, one of which claimed the benefit of the subscription.   Here, the unity of the original corporation is not disturbed.   It is merely allowed to construct its road by sections, and appropriate the proceeds arising from subscriptions to the payment of expenses incurred, according to the locality

in which the subscriptions were made. This was, doubtless, designed to stimulate local aid. It was clearly auxiliary to the main design of the original organization, and, therefore, whether it was the wisest policy that could have been adopted under the circumstances, it is unnecessary for us to inquire.

We do not comprehend the force of the distinction attempted to be drawn between the duties and liabilities of Ross as a stockholder, and as an individual, when applied to the inquiry before us. We can not understand how Ross, as a stockholder and director in the Peoria and Hannibal Railroad Company, can be regarded as accepting an amendment to its charter, and at the same time protesting against it as an individual. Having, by his own personal acts, accepted and assisted in fastening this amendment upon the company, to what principle of equity can he appeal for the purpose of being relieved from his private obligations to the company on account of the change thus wrought in its charter? His mouth is closed. He can not be heard to say, upon well settled principles of equitable estoppel, that the corporation has ceased to be that to which he became obligated.

The time specified for the completion of the road, in the 5th section of the act of Feb. 24, 1854, was not irrevocable. It was competent for the legislature and the company to change it at any time, by mutual consent. The State alone could take advantage of a failure in this respect on behalf of the company, and if it should choose to waive its rights on that account, no one else could complain. While it may be said that the time within which the road was to be completed may be presumed to have been within the contemplation of the parties when this instrument was executed, it may, on the other hand, be said, it may also be presumed to have been within their contemplation that this provision might be subsequently changed. So, the only way to have made time certainly of the essence of the contract, was to have inserted a stipulation to that effect.

The case cited relating to common highways, was governed
by an express statutory provision, and, on that account, has
no application here.

The cases holding parties relieved from like obligations
with that of Ross, where the evidence shows there was a sub-
sequent abandonment of the enterprise, would be in point
if the evidence here supported that theory. But, in our
opinion, it does not.

Work was done at different places along the line of the
road, according to the evidence, commencing in 1854, in small
quantities, every year, until in 1862, when it was completed
from Canton to Lewistown. Ross remained a director in the
company until in 1864, and the organization was kept up
until after 1869, when the road was completed from Lewis-
town to Rushville. After the completion of the road to
Lewistown, in 1862, work was for some time suspended, but
there is not a particle of evidence showing an abandonment
of the enterprise. On the contrary, efforts were being made
and renewed, at different intervals, to secure additional means
and enlist the aid of those whose influence would insure
success. Work, also, seems to have been done occasionally.
The line was run across the property of Ross, substantially
where the road is now built. Estimates, profiles, etc., were
made, and it seems to have been regarded by the president
and engineer of the company that the road was located there,
as we infer from the evidence, as early as in 1861 or 1862.
Ross, himself, may not have actually known of this location,
but he does not pretend to have been ignorant of the fact
that the organization of the company was kept up; that efforts
were being made, from time to time, to complete the road to
Rushville; that the hope of its completion was not abandoned,
and the probability that the road, if constructed, would run
not far from where it was built. Yet he made no effort to
cancel the instrument he had executed obligating himself to
convey the right of way, gave no notice that he did not
intend to be bound by its terms, but permitted the company

to retain this instrument, and complete the construction of the road over his property, before he made known a single one of the many objections now alleged against their rights under that instrument. Even if such time had elapsed as to authorize him to revoke the offer contained in the instrument, it was for him to determine whether he would do so or not, and it would seem, under the circumstances proved, that good faith would have required that he should have given notice to that effect before the company had taken possession of his property, so that it might have adopted another location, or taken proceedings to condemn this property before rendering itself otherwise liable.

We do not consider the question important, what line of road was in contemplation when this instrument was executed. The line, as constructed, is within the limits of the charter of the company, and, as in regard to time, so in this respect, if other limitations were intended, they should have been distinctly specified in the instrument. It was perfectly competent for him, in that way, to impose what restrictions or limitations he pleased.

There is one other circumstance to be noticed, tending strongly, in our opinion, to show that Ross is not equitably entitled to recover the possession of the right of way, even if we could regard the question of his right to damages against the company open.

Some short time subsequent to the completion of the road over his property, he commenced two suits against the Chicago, Burlington and Quincy Railroad Company, which was then, and is still, in possession of the road—one in ejectment for the possession of this right of way, and the other trespass *quare clausum fregit,* for damages to his real estate sustained in the construction of the road. These suits were dismissed by him pursuant to an understanding then had with those representing that company. Some witnesses swear that the agreement was, the company was to make a cattle-pass for Ross on this ground, under the railroad, and Ross was to dis-

miss the suits and make a deed of the right of way to the company. Ross, and other of the witnesses, disagree with so much of this as relates to the making of the deed. That the suits were to be dismissed, and the cattle-pass to be made, and that the suits were dismissed, and the cattle-pass made to the satisfaction of Ross, there is no controversy. Ross says his understanding was, the making of the cattle-pass was to go in reduction of his claim of damages. Upon this hypothesis, was not this a distinct abandonment of any right which he might have had to the possession of the property, and an election to take his damages instead? The pass cost $800, was made for the sole accommodation and convenience of Ross, and, of course, upon the hypothesis that the right to the possession of the property where it was made was in the company. He induced the company to expend this money, with the understanding it should have the benefit of it in his claim for damages. Shall he now be allowed to defeat this by taking the whole property? We think, in equity, this can not be allowed.

In every view we have been able to take of the case, we think the equities are in favor of the company.

We have not discussed the rights of the Chicago, Burlington and Quincy Railroad Company as distinct from those of the Peoria and Hannibal Railroad Company, as no question is made in that respect. We have assumed that, by the effect of the several conveyances, the Chicago, Burlington and Quincy Railroad Company occupies the same position the Peoria and Hannibal Railroad Company would if no conveyance had been made.

The decree is affirmed.

*Decree affirmed.*