ATLANTIC & PACIFIC R. R. Co., *Appellant*, v. CITY OF ST. LOUIS *et al.*

2  **Corporate Existence proved by Legislative Recognition.** The State having sold a railroad to certain individuals, requiring them to form themselves into a corporation, and the legislature having, in several subsequent acts, recognized the existence of the corporation; *Held*, that its existence could not be questioned by third parties, and such recognition dispensed with other evidence of the fact.

2  **Corporation Deed.** A deed from one corporation to another, is *prima facie* valid when signed by the proper officers, and under the corporate seal of the grantor, if, by law, the grantor has power to sell, and the grantee, to purchase. It devolves upon any one denying the validity of the deed on the ground that the stockholders have not assented to its execution, to prove that fact.

3.  **Railroad Consolidation: STATUTE CONSTRUED.** The act of March 15th, 1871, (Sess. Acts, p. 66), left it optional with the Atlantic & Pacific Railroad Company, and the South Pacific Railroad Company, to consolidate, or not, as they chose. Failure of the companies to

file with the Secretary of State the certificate required by the second section of that act, did not affect the validity of the conveyance by which, before the passage of the act, the South Pacific Company transferred to the other all its property, rights and franchises.

4. **Right of Individuals and the State to dispute the Exercise of Corporate Franchises.** Individuals may resist the condemnation of their lands for a right of way for a railroad, after the expiration of the time given by the charter of the company for the completion of the road, but cannot interfere to prevent the company extending its road after the expiration of that time, over a right of way acquired before the expiration. A city is an individual within the meaning of this rule, so that where a railroad company is, by its charter, authorized to build its road along or across the streets of any city or town, a city cannot prevent it from making an extension or building a branch road over one of its streets, on the ground that the time limited by charter for the completion of the road has expired. The State alone can proceed against the company to arrest the work on that ground.

5. **Branch Railroads:** CHARTER LIMITATIONS AS TO TIME OF BUILDING. A railroad company was authorized, by its charter, to build a main line and branches, and was required to complete its road within seventeen years from the date of the charter; *Held*, that this limitation did not apply to the building of branch roads, at least so as to prevent the company from building a branch road over a right of way acquired before the expiration of that period.

6 **Branch Railroads.** A railroad company having a power to build branches, may, under that power, build a line commencing near one of its termini, and running in the same general direction with the main line, so as to form practically an extension of the main line.

7. **Estoppel against Exercise of Corporate Powers:** MUNICIPAL POWER OVER STREETS : LICENSE. A railroad company which has, by its charter, a general power to build its road along or across the streets of a city, is not estopped from asserting the power to build on a particular street by the fact that it has once solicited and obtained from the city authorities, an ordinance permitting it to lay and use a track on that street for a limited time, and has actually laid and used it, as permitted by the ordinance. The city has no power to authorize the use of any street for a railroad. Such an ordinance is, therefore a nullity, and cannot create between the city and the company the relation of licensor and licensee, so as to make the company's action amount to an acceptance of a license.

8. ——— : ——— : ———. If a railroad company, having built a track upon a street of a city under a license from the city, subsequently tears up the track and surrenders possession of the street to the city, the fact that it has once accepted such license will not estop it from

asserting a power to build on that street, which was given by its charter, and was in existence when it accepted the license.

9. **Railroads**: ACCEPTANCE OF STATUTORY PRIVILEGES. An act passed in 1864, (Sess. Acts, p. 478,) authorized several railroad companies to connect their lines, and for that purposes granted them certain privileges. No time was prescribed within which the companies should accept the act. The connection was made in 1873; *Held*, that this was an acceptance of the act, and that the acceptance was in time.

10. **Section 27, Art. 4, Constitution of 1865,** which provided that "the General Assembly shall not pass special laws granting to any individual or company the right to lay down railroad tracks in the streets of any city or town," was prospective in its operation only, and did not repeal an act in force at the time of the adoption of the constitution, giving such a right.

### *Appeal from St. Louis Court of Appeals.*

This was a suit for an injuction brought by the Atlantic & Pacific Railroad Company against the city of St. Louis, its mayor, city engineer and other officers, agents and servants, to restrain them from tearing up or otherwise interfering with a railroad track which had been laid down by the plaintiff company in Poplar street and on the Levee in that city. Plaintiff claimed that it derived the right to lay and maintain the track from the charter of the Pacific Railroad Company, through a lease which it had taken of the road, property and franchises of that company. The charter of that company, granted by the Legislature in 1849, contained, among others, the following provisions:

Sec. 7. Said company shall have full power to survey, mark out, locate and construct a railroad from the city of St. Louis to the city of Jefferson, and thence to some point in the western line of Van Buren county, in this State; * * and may extend branch railroads to any point in any of the counties in which said road may be located.

Sec. 11. Said company may build said road along or across any State or county road, or the streets or wharves of any town or city, and over any stream or highway.

Sec. 12. Said company shall commence the construc-

tion of said road within seven years, and shall complete the same within ten years thereafter. Sess. Acts 1849, pp. 220, 221.

Section 7 was afterwards amended so as to read as follows : Said company shall have full power to survey, mark out, locate and construct a railroad from the Mississippi river or any other point in the city of St. Louis on any route the said company may deem most advantageous, to any point on the western line of the State, which the company may select. Sess. Acts 1850–51, p. 272, § 9.

In 1852 further amendments to the charter of said company were made by an act, of which section 1 vested in the Pacific Railroad Company the title to all the lands granted by the United States to the State of Missouri for railroad purposes, by the act of Congress of June 10th, 1852, so far as the same were applicable.

Section 2 authorized said company to lay out, construct and maintain a line of railway or branch railroad from any point on the main line of the Pacific railroad east of the Osage river, to any point on the western boundary of the State south of the Osage river, which the company might select.

Section 3 required the company to proceed as soon as practicable to locate said southwestern line or branch railroad, and to locate and select the lands granted by Congress.

Section 4 required the company to apply said lands to the construction of the main line from its commencement in the city of St. Louis to the point of divergence of the southwestern branch, and to the southwestern branch.

Section 9 authorized the Governor to issue bonds of the State to be used in building said branch road, and reserved to the State the right to sell the road in case of default in the payment of either principal or interest of said bonds. Sess. Acts 1852, p. 10.

In 1864 the General Assembly passed an act authorizing the Pacific and other railroads to connect their lines

in the county of St. Louis, and to lay switches to unload freight into the St. Louis Grain Elevator, whenever the boards of directors of said roads should agree and find it to the interests of their roads, and for that purpose authorized them to lay a track on the Levee or Front street, and authorized them to condemn the right of way over any land necessary for such tracks in conformity with their respective charters.

Under these several acts the Pacific Railroad, prior to 1870, had built and operated a main line from Seventh street, in the city of St. Louis, to Kansas City, and a branch from Franklin, a station on the main line thirty-five miles west of St. Louis, in a southwestwardly direction towards Springfield. Bonds had been issued by the State under the act of 1852, to aid in the construction of this southwest branch. The company having made default in the payment of interest due upon these bonds, the State, in 1866, declared a forfeiture of the branch road and all the franchises, privileges and rights appertaining to the same, (Sess. Acts 1866, pp. 107, 115), and ordered the road to be sold, the purchaser being required to complete the road by way of Springfield to the western boundary of the State. (Ib., p. 111, § 7). Under this act the road was sold to Fremont, and the name was changed to the Southwest Pacific Railroad Company.

In 1868 this road, and its franchises, were again declared forfeited to the State, and were sold by the State to Kingsland and certain other persons, who were required to form themselves into a body politic and corporate under the general laws of the State; said corporation, when formed, to be known as the South Pacific Railroad Company. (Sess. Acts 1868, p, 118). This company completed its road as far as Springfield.

On the 27th of July, 1866, the plaintiff, the Atlantic & Pacific Railroad Company was chartered by an act of Congress to build a railroad from Springfield, Missouri, to the Pacific Ocean. 14 U. S. Stat. at Large, 292.

By the second section of the act, a portion of the public lands were granted to the company to aid in the construction of the road, and it was provided, that if the route of the road should be found to be upon any other railroad route, to aid in the construction of which lands had been previously granted by the United States, as far as the routes were upon the same general line, the amount of land previously granted should be deducted from the amount granted by the act; provided that the company receiving the previous grant might assign their interest to the Atlantic & Pacific company, or might consolidate, confederate and associate with said company; and it was further provided that the Atlantic & Pacific company might avail itself of any power or franchise that might be conferred on it by any State. At that time the Southwest Branch was entitled to the land grant conferred by the act of Congress of June 10th, 1852, and the act of the Legislature of December 25th, 1852.

The Atlantic & Pacific company proceeded, under its charter, to build its road from Springfield southwestwardly into the Indian Territory. On the 26th of October, 1870, the South Pacific Company sold to the plaintiff the road from Franklin to Springfield, with all its rights, privileges and franchises, and made a deed to the same under the seal of the corporation, and signed by the proper officers. It did not appear at the trial whether the stockholders of the South Pacific company assented to the sale or not.

On the 29th of June, 1872, the plaintiff company, pursuant to the provisions of the act of March 24th, 1870, took a lease of the Pacific railroad, with all its property, rights, privileges and franchises. The latter company had at first located its depot in the city of St. Louis at Fourteenth street, fourteen blocks west of the Mississippi river. It afterward extended its road seven blocks eastward, and nearer to the river, and built its depot at Seventh street. This was the eastern terminus of the road for more than ten years prior to 1870. In that year the Pacific railroad

solicited and obtained from the city council of the city of St. Louis an ordinance granting permission to the company to lay and maintain a track branching off from its main track at a point near Ninth street, a few hundred feet west of its Seventh street depot, and running along Poplar street eastwardly to the Levee or Front street, at the Mississippi river, and thence northwardly along the Levee to the St. Louis Grain Elevator, a distance of nearly a mile. The track was built accordingly. The general direction of the Pacific railroad is from east to west. Between Ninth and Seventh streets the main track and Poplar street track are only a few feet apart.

This ordinance provided that this track should be removed at the end of two years. When the two years were about to expire, the company requested the city government to extend the time for one year longer. The city council thereupon passed an ordinance extending the time. This ordinance, however, contained provisions to which the company objected, and plaintiff, having in the meantime become lessee of the road, notified the city that it declined to accept the ordinance, tore up the track in several places, and discontinued its use.

After the lapse of three weeks it repaired the track, and began to use it again. The city council thereupon, passed an ordinance declaring the track a nuisance, and making it the duty of the executive officers of the city to remove it in case the company failed for thirty days to remove it themselves. The city engineer, acting under the orders of the mayor, was proceeding to execute this ordinance, when plaintiff sued out a preliminary injunction in the circuit court. On a final hearing, this was made perpetual by the court at special term, and that decree was affirmed in general term. On appeal to the Court of Appeals there was a reversal, and plaintiff appealed to this court.

*Thomas J. Portis* for appellant.

1. The Pacific railroad was authorized to build, maintain and operate this track at the time and place it did. Sess. Acts 1849, p. 219, § 11; Acts 1851, p. 268, § 9; Acts 1863, Adj. Sess. p. 478, §§ 1, 2; Ib., p. 50, § 14. *Porter v. N. Mo. R. R.,* 33 Mo. 137; *Lackland v. N. Mo. R. R.* 34 Mo. 259.

2. The fact of the company laying its track according to the ordinance of 1870, did not amount to an acceptance of a license, or a waiver by the company of the rights secured by its charter. The streets belong to and are in possession of the State and all the citizens of the State—one person as much as another owns and has possession of the streets in question, and has always had. The State, by its Legislature, had at the time the charter of the Pacific railroad was enacted absolute control and disposition of said streets, and said charter is a binding contract which cannot be altered by either laws or constitutions. The Pacific railroad corporation was one of the citizens of the State which, in common with all the rest, including the city of St. Louis, owned and possessed these very streets, and had as much right to enter upon them, and carry on its business there, as any other person. The only condition it had to observe was the same all were bound by, viz : not to monopolize the streets. At the time the city claims to have granted a license to the company to construct its railroad along said streets and to carry on its business there, it had the same right to the possession, and the very same possession of said streets as the city itself. The city could not license the company to enjoy that which it already had— to occupy that which it already had a right to occupy— nor could it prevent such enjoyment and occupation. The company did not acquire under and by the said ordinance any power or right which it did not have before under its charter, and said ordinance was of no force whatever.

Therefore it cannot be claimed that said company is estopped or in any manner prejudiced as to its legal rights by that ordinance or by anything done by itself or said city.   The relation of licensor and licensee did not exist between the city and the company, and could not under the laws of this State and the facts in this case.   The company did not enter into possession, or' remain so, under a license from the city, but being in possession under the authority of the State, it made an agreement with the city as to the mode of operating its railroad.   The ordinance was a nullity so far as it undertook to do more than that, the city council thereby assuming judicial functions which did not belong to them.   *Yates v. Milwaukee*, 10 Wall. 497; *Sloan v. Pacific R. R.*, 61 Mo. 24.

3.   Being a nullity, the men engaged in tearing up this track were without authority, their action was illegal, and they were mere trespassers, and should have been restrained, even if the court should believe that the plaintiff was acting without a warrant of law in the operation of the road, since the road was not an obstruction or a nuisance in fact.   Again, the company abandoned the use of the track for weeks, and notified the city of its intention to relay the track under the provisions of its charter, and of its refusal to accept its ordinance.   Again, the city itself tore up the track afterwards and ousted the company, and, therefore, the company was at full liberty to lay its track thereafter under its charter.

4.   The privilege to operate a line of railway over and through a street, is a franchise, and is not lost nor forfeited by the neglect of the company to complete the work within the time limited by the conditions of the grant.   The most that can be said of it is that the limitation of time is a condition subsequent upon the non-performance of which the estate vested is liable to be divested.   But an omission to perform, or a breach of a condition subsequent, does not, *ipso facto* determine the estate.   It merely exposes the estate to be determined at the election of the grantor.

Upon the performance, *vel non*, of a condition subsequent, the company has a right to be heard, and in a direct proceeding instituted for the very and special purpose of having a forfeiture adjudged. Not even the State can avail itself in a collateral proceeding of the non-user of a franchise, or not even an ordinary grantor can thus avail himself of the breach of a condition subsequent. *Brooklyn Central R. R. v. City R. R.*, 32 Barb. 358. Thus it must be held that if the railroad track in question is a prolongation and extension of the main line, and the time within which the company had authority, under its charter, to make such prolongation or extension had expired, the city of St. Louis could not complain, and could not maintain a legal proceeding on account thereof. Much less could it summarily destroy the road by force, and, having undertaken to do so, and still threatening to carry out such illegal purpose, this court will make the injunction perpetual.

5. The question as to what property, quantity of land, or what franchises the respondent could receive or hold, cannot be raised or determined in a suit with a third person, or stranger to the conveyance. *Chambers v. St. Louis*, 29 Mo. 576; *Laud v. Coffman*, 50 Mo. 252; *St. Louis v. Shields*, 62 Mo. 247; *Runyan v. Coster*, 14 Pet. 131; *Burns v. Railroad*, 9 Wis. 450; *Baird v. Bank*, 11 Serg. & R. 411; *Bank v. Poitiaux*, 3 Rand. 136; *Goundie v. Noth. W. Co.*, 7 Pa. Stat. 233; Ang. & Ames on Corp., §§ 151 to 154.

6. If at the time the lease of the Pacific railroad to the Atlantic & Pacific Railroad Company was made, the latter was engaged in using and operating as its own, under color of law, a connecting railroad, the same being a railroad from Franklin to Vinita, neither the Pacific railroad nor the public at large could inquire into the title of the Atlantic & Pacific Railroad Company to a fractional part of that road, much less could a wrong-doer make such an inquiry. In such a case, proof that the corporation was acting as such under legislative sanction, is sufficient evidence of right, except as against the State, and private

parties cannot enter upon the question of regularity. Cooley's Const. Limit. 254; *Kayser v. Trustees of Bremen*, 16 Mo. 88; *State v. Carr*, 5 N. H. 367; *Prest. and T. of Mendota v. Thompson*, 20 Ills. 197.

7. The Pacific Railroad Company was authorized to build this as a branch road. Sess. Acts 1849, p. 219, § 7; Acts 1851, p. 268, §§ 9, 11. The power given by the charter to build along and across public streets applies as well to the branches as to the main line. *Han. & St. Jo. R. R. v. Muder*, 49 Mo. 165; *Cleveland R. R. v. Speer*, 56 Penn. St. 325; *Mayor v. Penn. R. R. Co.*, 48 Penn. St. 355; *Philadelphia R. R. Co. v. Williams*, 54 Penn. St. 107; *Black v. Philadelphia*, 58 Penn. St. 252.

8. The public necessities required the laying of this track. This is recognized by the act of February 15th, 1864. This necessity alone authorized the company to lay it. *Miss. & Tenn. R. R. Co. v. Devaney*, 42 Miss. 555; *Carrollton Rwy. Co. v. Second Municipality*, 1 La. Ann. 128; *Knight v. Carrollton Rwy. Co.*, 9 La. Ann. 284; *Railway ex parte*, 2 Richardson 434; *So. Car. R. R. Co. v. Blake*, 9 Rich. 229.

9. Again, the power given by the 12th section of the original charter to construct and keep such turnouts, gates, depots * * and other buildings, machinery and fixtures as may be necessary, authorized the laying of this track as a necessary spur or appendage. The power of building side tracks is a continuing one and may be exercised whenever the necessities of the business require it. *Cleveland, etc. R. R. v. Speer*, 56 Penn. St. 335; *Han. & St. Joe. R. R. v. Muder*, 49 Mo. 165; *Chicago, etc. R. R. v. Wilson*, 17 Ill. 123; *Low v. Galena, etc. R. R.*, 18 Ill. 324; *Mayor v. Penn. R. R. Co.*, 48 Penn. St., 357; *Toledo R. R. v. Daniels*, 16 Ohio St., 390; *State v. Commissioners*, 23 N. J. L. 510; 1 La. Ann. 128; *Eldridge v. Smith*, 34 Vt. 484.

10. This track did not exceed in dimensions a spur-track or switch, such as is necessary at the terminus of a railroad. It extended from Seventh and Poplar to the

Levee and Poplar, a distance of seven squares, or about 700 yards, and was used for shipping grain to the St. Louis Elevator. The construction of such switches, and of even greater length, is authorized without any express power, but under the general right to build a railroad, even after the time to complete the road has expired. *Protzman v. Ind. R. R.*, 9 Ind. 469; *Brainard v. Clapp*, 10 Cush. 6; 16 Ohio St. 390; 17 Ill. 123; *Coster v. N. J. R. R.*, 24 N. J. L. 730; 2 Richardson 434; 9 Richardson 228.

11. Again, the act of February 15th, 1864, authorized the laying of this track. It empowered the several companies named to connect their lines in the manner granted in their respective charters. This authorized the Pacific company to use the power given in its charter of running over the streets of the city. This act was not repealed by Sec. 27, Art. 4, of the constitution of 1865. That section simply means that after 1865, no such special act shall be passed as this act of 1864. The company accepted the provisions of the act by doing precisely what it authorized them to do. This was sufficient acceptance. Cooley's Const. Limit. 254; *People v. Beigler*, Hill & Denio, (N. Y.) 135; *Jones v. Dana*, 24 Barb. 398; *Merchants' Bank v. Harrison*, 39 Mo. 433; *Gaines v. Bank of Miss.*, 12 Ark. 769.

12. The South Pacific company having sold out to the Atlantic & Pacific, the latter company became a connecting road with the Pacific at Franklin, (*Railroad Co. v. Railroad Co.*, 6 Am. Law Reg., N. S., 231) and entitled under the act of March 24th 1870, to take a lease of the Pacific, unless the defendant can show that the deed of the South Pacific to the Atlantic & Pacific was void. That deed passed the title irrevocably as against all persons except the State, even if the stockholders did not ratify it. *Farmers Loan & T. Co. v. Curtis*, 3 Seld., (7 N. Y.) 470. But here it is not even a question whether it can be inquired into, but whether the plaintiff must in the first instance affirmatively show such assent, notwithstanding it is manifest that the state

and stockholders have not objected, although the deed has not been in existence over three years.

13.   There was sufficient proof of the existence of the South Pacific company.   To prove the existence of a corporation it is only necessary to show that there is a law authorizing such a corporation to be formed, and then to prove that it did act as such corporation.   The proof of these two things makes out a *prima facie* case.   Cooley's Const. Limits. (3 Ed.,) 254; *People v. Beigler*, Hill & Denio, (N. Y.) 135; *St. Louis v. Shields*, 62 Mo. 247; or to show general reputation that it is a corporation; and the same rule applies to corporations formed under general laws, and to corporations formed under the laws of other States. *State v. Fitzsimmons* 30 Mo. 240; *Holmes v. Gilliland*, 41 Barb. 569.   Proof of an act of the Legislature authorizing such a corporation, and of the existence of two officers claiming to act for such corporation, establishes the existence of the corporation.   Oral evidence that the corporation is using the franchise which the act of the Legislature gives them, proves the existence of the corporation.   *Wilmington R. R. v. Saunders*, 3 Jones (N. C), 127; *Farmers' and Drovers' Bank v. Williamson*, 61 Mo. 259; *Dooley v. Wolcott*, 4 Allen (Mass.) 406; *Jones v. Dana*, 24 Barb. 397; *Merchants' Bank, v. Harrison*, 39 Mo. 433.

14.   The existence of the South Pacific Railroad Company having been shown, and its deed to the Atlantic & Pacific Railroad Company having been regularly executed, bearing the signatures of its president and secretary, with its corporate seal affixed, it is unnecessary to show that this deed was executed with the consent of the stockholders, especially after the lapse of over three years without any objection having been made by any one.   Herman on Estoppel, 510, § 540; *Swartz v. Page*, 13 Mo. 604; *People v. Law*, 34 Barb. 494; *Yates . v. Milwaukee*, 10 Wall. 497; *Musser v. Johnson*, 42 Mo. 74.

*Samuel Reber* for respondents

1. The right to lay the track on Poplar street is claimed under the charter of the Pacific railroad, amended by the act of March 1, 1851. I concede that originally that company had the right to lay its track from the Mississippi river, or any other point in the city of St. Louis westward, to the western boundary of the State. But having located its eastern terminus at Seventh street, and kept it there for many years, it exhausted its power and could not afterwards extend its road further east. *Brooklyn C. R. R. Co. v. Brooklyn City R. R. Co.*, 32 Barb. 358; 1 Redfield Railways, part 4, § 105, p. 410, (5th Ed.); 1 American Railway Cases 150; *Morris & E. R. R. Co. v. Central R. R. Co.*, 31 N. J. 207.

2. It is claimed that the road on Poplar street is a branch, and that by charter it had a right to build a branch. It is exceedingly difficult to affirm that the road on Poplar street, which was a mere continuation of the main line eastward and in the direction of the main line, was a branch; but waiving this, the road had to be completed in seventeen years, and it was not competent to build a branch after the expiration of that period. *Peavy v. The Calais R. R. Co.*, 30 Maine 498; *Morris & E. R. R. Co. v. Central R. R. Co.*, 31 N. J. 207.

3. It is said the Poplar street track is a spur or appendage, but if so, it should have been built within the limited time above. 31 N. J. 207; but it is an abuse of terms to call it a spur or appendage.

4. The act of February 15th, 1864, never was accepted, and the track was not built under its authority, but expressly under authority of the city ordinance. The Poplar street track, then, was not laid under authority of any act of the Legislature, but solely and expressly under authority of the ordinance No. 7,329; and the Pacific Railroad Company took only such title to the street as the ordinance gave, and that was a simple license to use and occupy it until January 1st, 1872. Having entered upon

and occupied the street under the city, the Pacific could not retain possession under claim of some other title or authority. The company became tenant or licensee of the city, and is estopped from denying its title; and if it had any other title, it must surrender possession before it could assert the title. Bigelow on Estoppel, 372, 386, 387, 384, 401, 412. The plaintiff, apparently with a view to show that the Pacific had surrendered the Poplar street track about the first of January, 1872, introduced evidence to show that about that time the Pacific made two or three small breaks in that track, and ceased to run cars on it for a short time; but it suffered the body of the track to remain unbroken, and gave no notice of its intention to surrender, and soon after repaired the track and ran its cars over it. It is true, that the Pacific, on the 10th of February, 1872, gave the city notice that it declined to accept the ordinance of January 26th, 1872.

5. If the Pacific had a right to build a track on Poplar street in 1870, it never conveyed the right to the plaintiff.

a. Its right was not transferable or vendible. It was a mere personal privilege, a license to use the street, and no property in it. Its right to the track on a public street was very different from its right to the track when it owned the soil. There it had a vendible estate. A license is personal and cannot be sold or transferred. *Mc-Pheeters v. Merimac Bridge Co.*, 28 Mo. 465; *People v. Duncan*, 41 Cal. 507. Its right was a mere license, whether it occupied the street under the authority of city ordinance, or under the acts of the General Assembly. The lease of the Pacific company to plaintiff was therefore inoperative to convey the right to use this street.

b. It was inoperative for a further reason. The plaintiff and the Pacific were not connecting or continuous roads, and the lease was therefore, not authorized by the act of March 24th, 1870. A railroad corporation cannot convey or lease its property and franchises without express

authority. 1 Redfield on Railways, (3 Ed.,) 589, § 142 ; Ib., (5 Ed.,) 410, § 105.

The plaintiff and Pacific Railroad Company were not connecting roads at the date of the lease or since, because the plaintiff had no title to the South Pacific Railroad, which extended from Franklin to Springfield. The plaintiff is a corporation created by act of Congress, with power to build and own a road from Springfield westward, but not eastward of Springfield. But it is claimed that the South Pacific Railroad Company was a corporation and owned a road from Springfield eastward to Franklin, and that plaintiff acquired the franchises and property of the South Pacific by virtue of the so-called deed of consolidation of the 26th of October, 1870, and of the confirmatory act of March 15, 1871. (Acts of 1871, p. 66.) This deed is inoperative for these reasons :

1. The act of March 24, 1870, under which it was made, requires the assent of the stockholders, and no assent is shown. The confirmatory act of March 15, 1871, does not confirm the deed, because the recitals of the first section are no evidence of the facts recited. (Marshall, C. J., says the Legislature can make laws but not facts.)

2. Because, also, the South Pacific could not transfer its property and franchises without express authority.

3. Because, also, the companies failed to file the certificate in the office of the Secretary of State required by the second section of the act.

4. Because, also, the deed being void for want of the assent of the stockholders, the constitution, Art. 4, Sec. 27, forbids any legislative confirmation.

5. Because the act attempts, in effect, to create a corporation to own and manage a railroad from Springfield to Franklin, and the Legislature is prohibited from creating any such corporation. The Legislature could no more add to the powers of the plaintiff (which is not a domestic or Missouri corporation) than it could create a corporation out and out.

To this I am answered by appellant's counsel that a deed under the corporate seal and signatures of the proper officers, is *prima facie* evidence that the officers did not exceed their authority, and the burden of showing that they did is on the other side. This doctrine is not disputed, where the corporation has the right to make the conveyance, either by express grant or by implication from the nature of its business. But when the corporation has no power to make the conveyance, except on special conditions, compliance with those conditions should be shown. See *St. Louis Public Schools v. Risley,* 28 Mo. 419; *Swartz v. Page,* 13 M. 610; *Shrewsbury B. & R'y Co. v. N. W. R'y Co.,* 6 H. L. Cases 135; 9 Exch. 75, 84.

HENRY, J.—The principal questions for consideration are.

1st. Had the Pacific Railroad Company the right to lay its track along Poplar street at the time it was placed there by the company?

2d. If so, was that right acquired from the State, or from the city of St. Louis?

3d. Did the Atlantic & Pacific Railroad Company, under the lease from the Pacific Railroad Company, acquire the property and franchises of the latter; and if the Pacific company had the right to lay, maintain and operate said track, was that right acquired by the Atlantic & Pacific company under said lease?

This last question will be considered first, as it involves the capacity of the Pacific company to convey, and of the Atlantic & Pacific to acquire and hold under such conveyance, the property and franchises of the Pacific company. The Pacific Railroad Company was incorporated by an act of the General Assembly of this State, approved March 29th, 1849, and by the 7th section of the act was empowered to construct a railroad from the city of St. Louis to Jefferson City, and thence to some point on the western line of Van Buren county in this State, and by the 11th

section was authorized to build said road along or across the streets of any city. By the 7th section it was authorized to extend branch railroads to any point in any of the counties in which said road might be located.

By an amendatory act, approved March 1st, 1851, the 7th section of the original act was so amended as to authorize said company to construct a railroad from the Mississippi river, or any other point in the city of St. Louis, on any route the company should deem most advantageous, to any point on the western line of the State, with power to construct lateral or branch railroads to any point or points in this State not exceeding fifty miles from its main line.

By an act of the General Assembly, approved December 25th, 1852, the said company was authorized to construct a line of railroad from any point on its main line east of the Osage river, to any point on the western boundary line of the State south of the Osage river. Under this act the company located a road from Franklin to the western line of the State near Neosho. By the act of 1866, this road was forfeited to the State, and sold to John C. Fremont, and the name of the road changed to "the Southwest Pacific Railroad Company."

By the act, approved March 17th, 1868, (Sess. Acts 1868, p. 118,) the road and its franchises were again declared forfeited to the State, and by the State sold to the South Pacific Railroad Company, or rather, to individuals therein named, who were authorized to organize that company.

There is no direct evidence that such a company was ever organized, but by an act of our Legislature, approved March 10th, 1869, the existence of that company was recognized, by directing the Governor, on application of the South Pacific Company to cause any number of said South Pacific railroad construction bonds, not exceeding one million of dollars, to be certified and delivered to some respon_

1. CORPORATE EXISTENCE PROVED BY LEGISLATIVE RECOGNITION.

sible bank or banks in New York or Boston, to the credit of the State Treasurer, which said company was authorized to negotiate or hypothecate in payment for iron for the construction of the road ; also, by an act of May 24th, 1870, which required the State Treasurer to pay to the South Pacific company all money received by him on account of the sales of any of the lands by said Fremont, &c., and providing that the receipt of the president of said company should be a sufficient voucher for the same; also, by an act, approved March 24th, 1871, by provision made for its consolidation with the Alantic & Pacific Railroad Company. The State having sold the Southwest Pacific railroad to individuals authorized to organize the South Pacific company, and afterwards, repeatedly by acts of the General Assembly recognized the existence of the corporation, it cannot now be questioned by third persons—even if the State could do so.

By an act of the General Assemby, approved March 24, 1870, it was provided : "That any railroad company organized in pursuance of the laws of this, or any other State, or of the United States, may lease or purchase all or any part of a railroad, with all its privileges, rights and franchises, real estate and other property, the whole or a part of which is in this State, if the lines of the road or roads of said companies are continuous or connected at a point either within or without this State."

By section 3 of the act of Congress incorporating the Atlantic & Pacific Railroad Company, it was provided : " That if such route (of the Atlantic & Pacific road) shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act, provided that the railroad company receiving the previous grant of land, may assign their interest to said Atlantic & Pacific Railroad Company, or may consolidate, confederate

and associate with said company upon the terms named in the first and seventeenth sections of this act."

That the routes of the South Pacific and of the Atlantic & Pacific were upon the same general line, will not be denied, and as the government had granted lands to aid in the construction of the South Pacific, it was of the class of roads which, by the third section of the act of Congress, the Atlantic & Pacific was authorized to purchase, and by the act of 24th of March, 1870, *supra*, the South Pacific was empowered to sell, and the Atlantic & Pacific to purchase and hold all the rights, franchises and property of the South Pacific company, because the two roads connected at Springfield, Mo.

By its deed, dated 21st day of October, 1870, the South Pacific company conveyed to the Atlantic and Pacific, its

2. CORPORATION DEED. railroad, completed and uncompleted, and all of its privileges, rights, franchises and property of every description. As the one company had the right to sell, and the other to purchase, it follows that the deed, under the seal of the corporation and signed by the proper officers of the company, is *prima facie* evidence that the officers did not exceed their authority, and if the assent of the stockholders to such conveyance was not had, it devolved upon the defendants to show that fact.

Having by purchase acquired all the rights, franchises and property of the South Pacific company, the Atlantic & Pacific acquired a right to lease or purchase the Pacific railroad under the act of March 24th, 1870. This was a right which the South Pacific had, and all its rights and franchises were conveyed to the Atlantic & Pacific. The Atlantic & Pacific and the South Pacific road became one continuous road, and connected at Franklin with the Pacific.

Respondents contend that the deed was inoperative, because the companies failed to file in the office of the

3. RAILROAD CONSOLIDATION: statute construed. Secretary of State the certificates required by the second section of the act of March

15th, 1871, (Sess. Acts 1871, p. 66). That was an act passed to authorize the merger and consolidation of these two companies. It was optional with the Atlantic & Pacific whether it would consolidate with the South Pacific company or not. Nearly a year before the passage of that act, the Atlantic & Pacific company had, as we have seen, purchased the franchises and property of the South Pacific company, and the title and terms of the act of 1871, show that the consolidation provided for was optional with the companies, and therefore the rights acquired by the Atlantic & Pacific company under the deed, did not depend upon a consolidation with the South Pacific company.

By that purchase it was invested with the rights, franchises and property of the South Pacific and thus having a connection with the Pacific road at Franklin, it was empowered by the act of 1870, to take a lease of that road, with all its privileges, rights and franchises, and among these, was the right to maintain and use the track of the Pacific company along Poplar street, if the latter company had the right to lay, maintain and use that track. It is conceded that the lease from the Pacific company to the Atlantic & Pacific company was duly executed, and that if the Atlantic & Pacific company had capacity under the law to take a lease of the Pacific road, that lease was effectual to pass all the property and franchises of the Pacific company which it could convey.

Had the Pacific Railroad Company the right to lay its track along Poplar street, St. Louis, in 1870 ? Respondents 4. RIGHT OF INDI-VIDUALS AND THE STATE TO DISPUTE THE EXERCISE OF CORPORATE FRAN-CHISES. contend that the Poplar street track was but an extension of the main line, and that, having located its eastern terminus at Seventh street, and kept it there for years prior to 1870, the company had exhausted its power and could not afterwards extend its road under its charter, citing *Brooklyn Central R. R. Co. v. Brooklyn City R. R. Co.*, 32 Barb. 364 ; 1 Am. Railway cases 150 ; *Morris & Essex R. R. Co. v. Central R. R. Co.*, 31 N. J. 207, and 1 Redfield, Sec. 1105, page 410.

The cases cited were controversies between railroad companies and individuals, and railroad companies. The State was not a party to the proceeding in either. In the first case the Jamaica company was authorized to construct a railroad commencing at an eligible point in the village of Brooklyn, and extending to any point in the village of Jamaica. The company located its western terminus at the foot of Atlantic street, and its eastern in the village of Jamaica, where it had ever since remained. The court says: "Having made its location and adhered to it for many years, it is concluded by what it has done. It had no franchise in Furman street which it could assign to the Central company."

The City Railroad Company was established, and commenced operating portions of its route long before the Central Railroad Company had an existence, and had laid down a railroad track in Furman street at its own expense. The Central company claimed that the Brooklyn & Jamaica company had the right by grant from the Legislature, to construct and operate a railroad through the streets of Brooklyn, which it had assigned to the Central company. It was not an attempt of the Brooklyn & Jamaica company to extend its line, or change its location ; but to confer upon the Central company a right to build and construct a road along Furman street, on the ground that the charter of the Brooklyn & Jamaica company gave this company the right to lay its track in the streets of Brooklyn

The court held that the Brooklyn & Jamaica company had no franchise in Furman street which it could assign to another company; that is a very different question from that presented for our determination, and while some of the observations of the court may be pertinent to the question before us, they were not necessary to the determination of the question in that case, but conceding as law all that is said in that opinion, it does not materially affect the question here. There is no evidence in this record that the eastern terminus of the Pacific railroad has ever

been formally selected. It is true, that it was built to Seventh street in St. Louis, and remained there for years; but it is also true, that it had previously remained for a length of time at Fourteenth street.

Supposing this track to be, as contended by respondent but an extension of the Pacific road, and that the time for the completion of that road, seventeen years from the date of the charter, had expired before this Poplar street track was laid, is it for the city of St. Louis, or any individual, to object to such extension, on that ground, if the State choose to permit the extension? There was no private property to condemn for a right of way, that had been granted along the streets by the General Assembly. It may be conceded that after the expiration of the time limited by the charter for the completion of a railroad, the property of individuals cannot be condemned for a right of way. This doctrine is amply sustained by the authorities cited by respondents. In *Peavy v. Calais R. R. Co.*, 30 Me. 499, the court said: "By the act of February, 1838, two years further were allowed to the company to complete their road. After the expiration of that period, they could not take the lands of individuals without their consent, for the extension of their road. They must act within the time given them by the Legislature."

But suppose that consent to have been obtained before the expiration of the time, is that case an authority for saying that still the company could not have proceeded to extend its road through the land? It does not go to that extreme, but only decides, that unless the consent be obtained within the time limited for the completion of the road, a right of way could not be condemned afterwards. Individuals may resist the condemnation of their lands for a right of way, after the expiration of the time given by the charter for the completion of the road, but cannot interfere to prevent the company from extending its road after the expiration of that time, over a right of way already acquired. The general principle, we think, is fully

sustained by *Chambers v. St. Louis,* 29 Mo. 576; *Land v. Coffman,* 50 Mo. 252; *City of St. Louis v. Shields,* 62 Mo. 247.

In *Chambers v. St. Louis,* Scott, J., said: "Whether these lands are necessary for the corporation, is a question that can only arise in a proceeding instituted by the State against the city for abusing her right to purchase land. The city had a power to purchase; if that power has been exceeded, then it has been violated, and the city charter may be forfeited in a suitable proceeding; and until that is done she will hold the lands. Shall she be compelled to contest, with every occupant who may get possession of them, her right to take and hold the lands? ' There being a right in the city to purchase, if there is a capacity in the vendor to convey so soon as a conveyance is made there is a complete sale; and if the corporation, in purchasing, violates or abuses the power to do so, that is no concern of the vendor or his heirs. It is a matter between the State and the city."

And in *Land v. Coffman,* Judge Adams, speaking for the court, in relation to the capacity of a railroad company to receive and dispose of lands, says: "But the amount of lands it may receive cannot be decided between these parties; conceding the power to receive lands for the purpose aforesaid, no one except the State can raise the question as to the amount that may be received."

The case of the *Brooklyn Central Railroad Co. v. Brooklyn City Railroad Co.,* 32 Barb., relied upon by respondents, fully sustains this view. There the court said: "If the Central company claim that the common council have the right to annul or impair the grant to the city company for breach of the condition to complete the work in a given time, it encounters this impediment. The condition to complete within a given time, is one of those distinguished in law as conditions subsequent. The effect of a deed with a condition subsequent, is to vest the estate in the grantee, subject to be defeated by his omission to perform the con-

dition.   The omission does not *ipso facto* determine the estate, but exposes it to be determined at the election of the grantor.   These conditions and forfeitures are not favored in law, because they tend to destroy estates.   When the grantor institutes proceedings to recover the estate for conditions broken, the grantee may show that its performance has become impossible by reason of the acts of the grantor, or has been waived or dispensed with."   Here the State is the grantor, and she alone can  proceed against the company to arrest its proceedings to extend the road for a breach of the condition.

In the case of the *Mississippi & Tennessee Railroad Co. v. Devaney*, 42 Miss. 555, Shackleford, J., delivering the opinion of the court, said :   "Again, if the right of way had been purchased from the defendant in error (Devaney) over his land, as proposed by the plaintiff in error (said Co.), and the connection made as it has been done, without opposition from Devaney, who could  object to the running of their cars over their joint bridge and upon the track of Mississippi Central road ?"

In that case the road had been completed to Granada, crossing the Yallabusha river over its own bridge.   The Mississippi Central road also ran to Granada, crossing the same stream over a bridge of its own.   In 1863 these bridges were burned by military forces, and the pecuniary embarrassments of the companies compelled them to unite in rebuilding the bridge of the Mississippi Central, and this necessitated the connection of the Mississippi & Tennessee with the other road, at a point north of Granada, and of course the abandonment of its road from Granada to the point at which it deflected to make that connection. The court held, in an able opinion, that railroad companies have power to re-locate the lines of their roads, after their completion under the first location, and to condemn, for the purpose of such re-location, private property, if there be a manifest necessity for the change, and no detriment thereby accrues to the public.   We do not refer to that

portion of the opinion as approving it, but to show the diversity of opinion on this subject, and that courts of the highest respectability have claimed for railroad companies the right to condemn the lands of individuals to make a change of location of their roads, even after they have been completed and operated. The case, however, fully sustains the doctrine that no individual can interfere to prevent a company from laying its track over a right of way already acquired.

In *Ross v. The C. B. & Q. R. R. Co.*, 77 Ill. 127, the statute of the Legislature of Illinois required the road to be completed within eight years after its passage. Before the expiration of that time Ross, the defendant, had by his deed agreed to convey to the company a right of way through any land or town lots owned by him in Fulton county, Illinois. The company built its road through his premises, after the expiration of the eight years given by the act for the completion of the road, and he sued in ejectment, and the company filed its bill to enjoin that proceeding and compel Ross to convey the right of way. There was a decree in conformity to the prayer of the company's bill, and Ross appealed to the Supreme Court. Scholfield, J., delivering the opinion of the court, said: "The time specified for the completion of the road, in the 5th section of the act of February, 1854, was not irrevocable. It was competent for the Legislature and the company to change it at any time by mutual consent. The State alone could take advantage of a failure in this respect on behalf of the company, and if it should choose to waive its rights on that account, no one else could complain. While it may be said that the time within which the road was to be completed, may be presumed to have been within the contemplation of the parties when this instrument was executed, it may, on the other hand be said, it may also be presumed to have been within their contemplation that this provision might be subsequently changed."

The case of the *Attorney-General v. West Wis. R. R. Co.*, 36 Wis. 466, cited by the Court of Appeals, was a proceeding by the State, and does not conflict with the views we have expressed. It would, it strikes us, be a monstrous doctrine that a railroad company, having completed nine-tenths of its road, and acquired the right of way for its entire length, within the time prescribed by the charter for its completion, could by an individual be arrested in the completion of the remaining one-tenth, after the expiration of the time; and in this contest it is to be borne in mind, that the city of St. Louis is but an individual, having only the rights of an individual, and in no sense representing the State.

Now, whether we regard this track on Poplar street to the Levee and thence to the elevator, an extension, a branch road, a spur, or a side-track, can make no difference, because, by its charter, the company had authority to build branch and lateral roads and side-tracks, and whether these could only be built as the main road, within the time for completing the latter, yet no one could prevent the company from building them over rights of way already acquired, except the State of Missouri.

But we are not prepared to say that a company which is limited as to the time given for the completion of its 5. BRANCH RAIL- main line, and has power to build branch ROADS: charter limitations as to roads must do so within that time, or forfeits time of building. the right to build them. There was no limit to the authority to build branch roads by the charter of the Pacific company, except that they were not to exceed in length fifty miles from its main line. The railroad companies were chartered and assisted by the State to complete their roads, for the purpose of developing the resources of the State. Some of these roads ran through sparsely settled counties, to which, it was believed, that the construction of railroads would attract population.

But few of them at first, were in a condition to build branch roads, and the State was called upon, by all of

them, and liberally responded to loan its money and credit
to aid them to complete their main lines.   The necessity
for branch roads probably did not then exist, and would
not arise until after the completion of the main lines.  But
whether they could construct these branch roads, and for
that purpose condemn the lands of individuals after the
expiration of the time for the completion of the main road,
we will not now determine, but we think that the author-
ity of this company to build a branch road, over a right of
way already acquired, is fully settled by the cases above
cited.

The Court of Appeals and the respondents' attorney
seem to think that it could not be a branch road, because
6. BRANCH RAIL- it ran in the same general direction as the
ROADS.          main track.   If the company, by building to
Seventh street, and there stopping for years, is precluded
forever from extending its main line east, under its char-
ter, as held by the Court of Appeals, then that is as much
its eastern terminus as if it had been so fixed by the char-
ter.   Now, is there anything in the charter which forbids
it from building a branch road east to the Mississippi river?
Can it be that the company may run a branch road to any
point of the compass except east, or in the general direc-
tion of the main line ?   We think such a position untena-
ble.

But suppose that we are wrong, and that under the
original charter the Pacific Railroad Company, after com-
pleting its road to Seventh street, had no right to extend it
to the Mississippi, or to construct a branch road to the
Mississippi river, or any distance east of Seventh street;
yet, by an act of the General Assembly of February 15th,
1864, "to provide for the convenient delivery of railroad
freight in the city of St. Louis," the North · Missouri, the
Iron Mountain and the Pacific railroad companies were
authorized to connect their lines of roads with the main
lines of each other within the county of St. Louis, and to
lay switches to unload freight into the St. Louis grain ele-

vator, &c. It is conceded by the respondents, and this seems to have been the opinion of the Court of Appeals, that the Pacific company had authority by that act to lay its track along the street, but it is contended that the company waived the right by accepting the provisions of the ordinance of the city of St. Louis, authorizing the company to lay its track along Poplar street, that it forfeited the right conferred by the statute by non-acceptance, and, that the act was repealed by the constitution of 1865.

In July or August, 1870, with the assent of the city given by ordinance on certain conditions, the Pacific com-7. ESTOPPEL AGAINST EXERCISE OF CORPORATE POWERS: municipal power over streets: license. pany laid a track from its main track near Ninth street, along Poplar to Front street, or the Levee on the bank of the Mississippi river, thence along the Levee to the St. Louis grain elevator, there connecting with the North Missouri railroad. The city, as a condition to its assent, required that the track along Poplar street should be torn up in January, 1872. Afterwards, on the 26th of January, 1872, at the request of the company, the city passed an ordinance extending the privilege to the 1st of January, 1873, on certain conditions in the ordinance specified. After the passage of this last ordinance in February, 1872, the Pacific company declined to accept its provisions, notified the city of the fact, and tore up the track at a point between Eighth and Ninth streets, at the Fifth street crossing, and near the elevator, making breaks of several feet at those points; and the track remained in that condition for several weeks, when it was relaid by the company.

The assent of the city was not necessary to perfect the right which the company acquired by the act of the General Assembly to lay this track along the street. The State has absolute control of the streets in cities and other public highways; and a city has no authority, unless it be conferred by the Legislature, to authorize the use of any street within its limits for the construction and operation of a railroad to be traversed by a locomotive worked by

steam.    Dillon on Mun. Corp., §§ 575, 578, 579.   And said the Court of Appeals in this case :   " Streets, in incorporated cities and other public highways, are subject to the paramount authority of the Legislature in the regulation of their use."

Did the acceptance of the privilege from the city to lay the track estop the company from claiming the right to lay it under the act of the General Assembly ?   The ordinance was a nullity.   The city undertook to grant a franchise which it had no authority whatever to dispose of. Upon its face, the ordinance was null and void.   The company received nothing from the city as a consideration for relinquishing, or waiving the privilege granted by the General Assembly.   The theory upon which railroad compahave been incorporated with power to condemn private property for rights of way is that they are public, not private enterprises—that the public has an interest in their construction and operation, and that the public welfare demands them.

Some courts have even gone so far as to hold that they can be compelled by mandamus to build them.   The right of the city in its streets, and the control which the Legislature has over them, are matters of which the courts will take judicial notice.    The city ordinance conferred no right, and could impose no obligation upon the company inconsistent with, or impairing the franchise granted by the State.   The Legislature deemed it a matter of public concern, that the Pacific road should connect with the North Missouri and the Iron Mountain roads, at the St. Louis elevator, and passed an act for that purpose, and it is doubtful, if the right to make that connection by laying the track in question, could have been waived by the company, even for a valuable consideration received from the city, other than another route which would have answered the public demand.    It is questionable whether the courts would not hold such a contract void as against public policy—and it seems to us idle to talk of a waiver of that

right by asking the consent of the city, and obtaining it—to do, what the company already had the right to do, without such consent. Why it was asked, cannot be conjectured, unless it was done in a spirit of conciliation by the company, to have the good will, rather than the emnity of the city authorities, and out of complaisance to them, to get their consent for doing what the company could just as well have done without such consent. There was no such relation as that of licensor and licensee created by the ordinance of the city, between the city and the Pacific company, for as we have seen, the city was utterly incapable of conferring upon the company the right to lay its track along a street of the city.

But if such a relation were created, the company surrendered the possession of the street to the city in February, 1872, tore up a portion of the track, abandoned the use of it, and this state of things continued for three weeks, and, then, the company under the right granted by the State, repaired its track and resumed its use. It did surrender to the city the possession of the street, and within the three weeks which elapsed after the company notified the city, that it rejected the conditions of the ordinance, the city authorities had complete possession of the street in question, and could have cleared it of the obstruction created by the company's track. In no view that can be taken of the case, has the doctrine of estoppel any application.

But it is contended that the company forfeited the franchise granted by the act, by non-acceptance. There was no time prescribed by the act within which the connection at the elevator should be made, and the laying of their tracks by the several companies named in the act, was an acceptance of its provisions. When the Pacific company first laid its track, it had no valid authority to do so, except from the State, and the laying of the track then, must be referred to the right conferred by the act. At all events, it accepted it, after

*8. ——: ——: ——.*

*9. RAILROADS: acceptance of statutory privileges.*

it had abandoned the track and surrendered the street to the city, by repairing the track, where it had been torn up, and asserting its right to use and maintain it under the act of the General Assembly.

But respondent insists that the 27th section of article 4, of the constitution of 1865, repealed the act in question. That section reads as follows: "The General Assembly shall not pass special laws granting to any individual or company the right to lay down railroad tracks in the streets of any city or town." There is no conflict between this section and the act of the Legislature. This section of the constitution is prospective in its operation. Numerous decisions, and notably that in the case of the *State ex rel. v. Macon County*, 41 Mo. 457, have settled that question. The act of the General Assembly upon which the company relies, was passed before the adoption of the constitution, and the 17th section of the constitution was restrictive of the power of subsequent legislatures, and had no retrospective effect to repeal past legislation.

10. SECTION 27, ART. 4, constitution of 1865.

The fact, if established, that the track destroyed the use of the street for any other purpose, cannot be considered as depriving the company of the right granted by the General Assembly. It would have been a good reason perhaps, for a refusal to permit railroad companies to lay their tracks along the narrow streets of the old town of St. Louis; but the Legislature has seen proper to give to the Pacific company that right, and neither the city nor the courts can rightfully deprive it of the franchise. That the track was badly constructed and kept, and that trains passed over it at all hours, and at a dangerous rate of speed, were matters which might have been regulated by reasonable ordinances of the city, but did not authorize the city to tear up the track, or to prevent the company from relaying it.

Respondents contend that the Pacific Railroad Company had no vendible interest in Poplar street, or its track on

Poplar street, and cite as authority to sustain them, *The People v. Duncan*, 41 Cal. 510, and *McPheeters v. Merimac Bridge Co.*, 29 Mo. 465. In these cases it was held that a franchise could not be sold except by the authority of the granting power. Here the grantor was the State, and the State authorized the sale.

We have not examined the question whether this cause was properly certified from this court to the Court of Appeals. Whether it was or not, it is now here, and the other questions presented by the record must be determined, and therefore that is not now a material question.

We have given this case the attention which its importance demands, and a careful examination of the authorities has satisfied us that the judgment of the Court of Appeals should be, and with the concurrence of the entire bench, it is accordingly reversed.

REVERSED.